## LAKE & EXPORT COAL CORPORATION v. CHESAPEAKE & O. RY. CO.

(Circuit Court of Appeals, Fourth Circuit. September 29, 1924.)

No. 2237.

1. **Carriers** ⊗⟹47(1) — **Defense to action for freight and demurrage held not sustained, in that employee's authority to buy shipment for amount due as part of price not shown.**

In action by carrier against shipper of coal for freight charges and demurrage, a defense that plaintiff bought the coal, and that the freight and demurrage due were to be a part of the price, *held* not sustained, in that it was not shown that employee of plaintiff alleged to have made the contract had authority to make it, or was held out as having such authority.

2. **Carriers** ⊗⟹35—**Cannot legally pay for supplies with transportation.**

A railroad common carrier *held* without legal authority to purchase coal and pay for the same by releasing a claim for freight and demurrage.

In Error to the District Court of the United States for the Southern District of West Virginia, at Huntington; George W. McClintic, Judge.

Action at law by the Chesapeake & Ohio Railway Company against the Lake & Export Coal Corporation. Judgment for plaintiff, and defendant brings error. Affirmed.

John H. Meek and Holt, Duncan & Holt, all of Huntington, W. Va., for plaintiff in error.

Douglas W. Brown, C. W. Strickling, and Fitzpatrick, Brown & Davis, all of Huntington, W. Va., for defendant in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. In the court below defendant in error, the Chesapeake & Ohio Railway Company, hereinafter called the railroad, sued the Lake & Export Coal Corporation, herein styled the shipper, for a trifle over $10,000 which the railroad said was due it by the shipper for freight and demurrage on eight cars of coal which in November, 1920, were shipped by the shipper to the Newport News Coal Exchange. When these arrived at their destination at various dates in late November and early December of the year named, they were at once inspected by the consignee, and the coal was all rejected as not up to the standard of the pool to which it had been shipped. Prompt written notice was given the shipper of these rejections. It was requested to make disposition of the coal, and was warned that after certain specified dates demurrage would begin to run. Nevertheless for nearly eight months the coal remained on the cars, until in August, 1921, the railroad sold it, realizing therefrom about $275, which it credited upon the freight bills it claimed the shipper owed it.

[1] The defense was that on January 2, 1921, approximately a month after the inspection and rejection of the coal, the railroad purchased it from the shipper at a figure subsequently fixed at $1,080.40 or $2 per ton f. o. b. the mines from which it had been shipped, and agreed to cancel and release its claims for freight and demurrage. It offered the testimony of a Mr. Poindexter, who about the time the coal was shipped became its general manager, having previously been in the employ of the railroad. He said that on the 2d of January, 1921, he had a conversation with a Mr. Davin, who was the chairman of the Railroad's Allotment Commission, which ascertained the capacity of mines and allocated cars to them, and that in this conversation Davin agreed to buy the coal from the railroad on the f. o. b. mine basis at such price as Davin should name, and that something over three months later Davin fixed $2 a ton f. o. b. mine as the figure he would pay. The witness said that, as the shipper relied on this agreement, it did not after January 2, 1921,

make any effort to dispose of the coal. He testified that he did not know in what way as a bookkeeping matter the railroad would handle the freight and demurrage. All that was settled was the shipper would not have to pay them. Another official of the shipper testified that in April, 1921, he heard Poindexter ask Davin at what price he should bill the coal, and that Davin answered, "$2 per ton." When examined as a witness Davin said that he had no authority to buy coal for the railroad and had not bought or assumed to buy the coal in question. All that he had ever told Poindexter was that he would do all he could to help to dispose of the coal. Davin admitted that on a number of occasions he had been specially authorized to purchase particular lots of coal, and had done so, but only when such specific authority had been given him. He further said that with a single exception all of these purchases were subsequent to April, 1921, and no evidence was offered to show that before that date the shipper knew of the one purchase made by Davin.

In this state of the testimony, the court ruled (1) that an agreement by which a railroad bought coal at so much a ton, and either agreed to release or to assume the freight or demurrage then due, would be illegal; and (2) that it was not shown that Davin had authority to enter into such an agreement if he in fact ever assumed to do so. The soundness of the latter of these rulings seems to be too clear for argument. There is no proof that Davin was ever given general authority to buy coal. The title of the office he held with the railroad and the duties with which he was charged were not of a nature to suggest that buying of coal was any part of his work. Prior to the date of the alleged agreement with the shipper, there was nothing which would support a finding that the railroad had held him out as one empowered to make purchases for it; much less to enter on its behalf into a bargain so much out of the ordinary course as that upon which the shipper relies.

[2] As there was no evidence from which the jury would have been justified in finding that the railroad had ever made any agreement with the shipper, it is unnecessary to go into nice discussion as to whether the railroad could legally have made such a bargain as the shipper claims it did. It is enough to say that there can be little question that on this point also the learned court below was right. A railroad has need of much coal, and must buy a great deal of it. It is free to pay what it sees fit for it, and very possibly it may use whatever method it chooses for calculating what it will give, always provided that it in no way confuses its position as a buyer seeking coal in the cheapest market and on the most favorable terms with its duty as a common carrier by rail in interstate commerce to haul impartially for all and sundry at the rate and upon the terms and conditions set forth in its legally promulgated tariffs. The public interest, that there be no rebating or favoritism of any kind, is so exigent that in this matter the ordinary rule, that that is certain which can be made certain, may not always lawfully be applied. When the Hepburn Act was passed, the New York Central Railroad owed one Gray a balance of $544.23 on a contract by which, in return for services already rendered, he was to receive $600 in transportation. It was held that, while he was entitled to demand that sum in money from the railroad, it was not permitted to furnish it to him in transportation. In short, he would have to buy tickets, and it would have to pay him what it owed him in cash, and not in passes. New York Central Railroad Co. v. Gray, 239 U. S. 583, 36 Sup. Ct. 176, 60 L. Ed. 451. See, also, Illinois Central Railroad Co. v. Hoopes & Sons (D. C.) 233 Fed. 135.

The court instructed the jury that, upon the railroad's being notified by the shipper that the latter claimed that it had sold the coal to the railroad, it was the duty of the railroad to give the shipper notice that the railroad would sell or dump the coal and release the cars, and thereafter it was the duty of the railroad within a reasonable time to sell or dump the coal to stop the accummulation of demurrage. The jury acted upon this instruction by cutting down the railroad's claim to some $5,400, and it does not here complain.

Affirmed.